# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA JASPER DIVISION

|  |  |  |
|---|---|---|
| NINA POSEY, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 6:16-cv-01891-KOB |
| NANCY BERRYHILL | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On April 28, 2014, the claimant, Nina Posey, protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (R. 184-196). In both applications, the claimant alleged disability beginning July 24, 2012. (R. 109, 188). These claims were denied initially on June 10, 2014. (R. 119, 125). The claimant then filed a written request for hearing on June 19, 2014. (R. 132).

In a decision dated November 6, 2015, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 18-30). On September 28, 2016, the Appeals Council denied the claimant's request for review. (R. 1-4). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3). For the reasons stated below, this court will AFFIRM the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1.  whether the ALJ fully and fairly developed the record concerning the severity of the claimant's alleged carpal tunnel syndrome;

2.  whether the ALJ accorded proper weight to the opinion of the claimant's cardiologist; and

3.  whether substantial evidence supports the ALJ's finding that the claimant can perform light work.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and substantial evidence supports his factual findings. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

To make this determination the Commissioner employs a five-step, sequential evaluation

process:

> (1)     Is the person presently unemployed?
> (2)     Is the person's impairment severe?
> (3)     Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)     Is the person unable to perform his or her former occupation?
> (5)     Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

The claimant focuses her arguments on the ALJ's determination of her residual functional capacity. The assessment of the claimant's residual functional capacity determines the claimant's ability to do work despite her impairments and should be "based upon all of the relevant evidence." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. § 404.1545(a). The ALJ makes this determination by considering the claimant's physical, mental, and other abilities affected by the impairment(s). 20 C.F.R. § 416.945(b)-(d).

## V. FACTS

The claimant was 53 years old at the time of the ALJ hearing. (R. 42). The claimant attended school until the 10th grade and had previously worked as a chicken packer at Marshall Durbin Corporation from 2006 through 2010. (R. 45, 238-39, 273). The claimant is a life-long smoker and alleges disability based on possessing a pacemaker, and suffering from seizures, carpal tunnel syndrome, arthritis, chronic obstructive pulmonary disease (COPD), high cholesterol, Bell's palsy, and colon issues. (R. 250).

---

[1]Although *Bower* is a supplemental security income case, the same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

*Physical Impairments*

In October of 2007, the claimant first sought treatment for a seizure disorder and fibromyalgia from Dr. Scott Boswell, a specialist in family medicine. At that time, Dr. Boswell ruled out fibromyalgia, as well as anemia. But in November of 2007, Dr. Boswell assessed the claimant to have arthritis, low back pain and an abnormal chest x-ray. In 2008, Dr. Boswell diagnosed the claimant with COPD, osteoporosis, hyperlipidemia, and anxiety disorder.

In August of 2008, the claimant told Dr. Boswell that for the past year she had been experiencing hand pain with tingling that was keeping her up at night. Dr. Boswell performed an electromyogram and nerve conduction velocity test ("EMG and NCV" test) that produced only "indeterminate" results. (R. 673-79). Dr. Boswell concluded that the examination was "indeterminate" because "[t]he slow CV of the median motor nerves bilaterally is of uncertain significance in light of the very normal latencies and amplitudes. The normal right median palmer latency goes against a carpal tunnel syndrome. These unusual findings may represent some atypical non-localized median neuropathy." Dr. Boswell recommended "clinical correlation."

Dr. Boswell did not order any additional EMG or NCV tests in 2009, and the claimant continued to work packing chickens at Marshall Durbin through 2010. (R. 238). In 2009, Dr. Boswell added rheumatoid arthritis, osteopenia, osteoarthritis, hypertension, and chest wall pain to his assessment of the claimant's medical condition. In addition, a myocardial scan—a test that determines how well blood flows throughout the heart as well as how well the heart muscle is pumping—indicated a positive result for reversible ischemia, which is poor blood flow to a particular organ that can be reversed by medication or surgery. (R. 661-64). The claimant had a permanent pacemaker implanted in August of 2009 because of a third degree atrioventricular

block – a condition where the electric impulses that tell the heart to beat are slowed or blocked. (R. 486-490). Doctors at Princeton Baptist Medical Center replaced the pacemaker in 2014. (R. 469). The claimant also had a left-sided cardiac catheterization to address the claimant's angina symptoms, that is, chest pain due to reduced blood flow to her heart. (R. 309).

In 2010, the claimant quit working at Marshall Durbin and did not seek employment elsewhere. (R. 202). The claimant was also seen twice for chronic diarrhea in 2012, and in 2013 she had a colonoscopy that produced normal results. (R. 397, 415-19).

In 2013, the claimant went to Walker Baptist Medical Center claiming shortness of breath with chest pain, chills, and wheezing. (R. 313). The claimant told a doctor at Walker Baptist that "she knew that all of her issues were respiratory in nature [and] related to her longstanding smoking history," and that she genuinely wanted to make an effort to quit smoking. (R. 315). Two days later, the claimant went to Whatley Health Services with dyspnea (labored breathing), but did not complain of chest pain and irregular heartbeat or palpitations at that time. (R. 319).

In November of 2013, the claimant arrived at Princeton Baptist Medical Center by ambulance, experiencing "pain and tenderness around [her] pacemaker site." (R. 329). The claimant stated that the pain began three to five days earlier, though the pain was mild. Testing showed that the claimant's pacemaker was correctly in place, and the claimant was told to follow up with her cardiologist. (R. 332). The Medical Center noted that the claimant probably had "obstructive pulmonary changes and emphysema," which is a lung condition that causes shortness of breath. (R. 336).

In 2014, Walker Baptist Medical Center admitted the claimant for breathing problems. Walker Baptist treated her with steroids and bronchodilators for sudden worsening symptoms of COPD. The claimant was counseled to stop smoking. A physician's assistant at Walker Baptist

Medical Center noted that the claimant's "active problems" included COPD, depression, seizure disorder, coronary artery disease, third degree atrioventricular block, and tobacco dependence. (R. 348). In late April 2014, the claimant told a doctor that she had quit smoking. (R. 460).

In the same month, claimant returned to Walker Baptist Medical Center, complaining of partial facial paralysis. She could not contract the facial muscles on the left side of her face nor could she feel sensation on her left cheek, left jaw, or left side of her forehead. Walker Baptist diagnosed the claimant with facial paralysis/Bell's palsy. (R. 347).

In 2014, the claimant began seeing cardiologist Dr. Farrell Mendelsohn. Dr. Mendelsohn performed an electrocardiogram on each of the claimant's visits. And on each occasion he noted that the claimant was able to participate in exercise testing or an exercise program. In 2015, the claimant saw Dr. Mendelsohn again for fatigue. Dr. Mendelsohn completed another electrocardiogram, but concluded that the claimant's fatigue was likely a result of current stress. At the time, the claimant was smoking again, and Dr. Mendelsohn ordered the claimant to a "smoking and tobacco use cessation counseling visit." (R. 486-526).

At the request of the Disability Determination Service, in August of 2015, Dr. Harold Settle, a cardiologist, performed a consultative examination on the claimant. Dr. Settle noted that the claimant had a functioning pacemaker, COPD, history of controlled hypertension, dyslipidemia, and generalized tonic clonic seizure disorder, which is a disorder that causes jerking of parts or the whole body, also known as grand mal seizure disorder.

Dr. Settle indicated that the claimant was capable of occasionally lifting and carrying twenty pounds, could sit for a total of seven hours in an eight-hour work day, and could stand for three hours and walk for two hours in an eight-hour work day. Dr. Settle noted that the claimant could use both hands and both feet frequently for work-related activities. The claimant could

occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders or scaffolds. Dr. Settle found that the claimant could perform activities like shopping, walking a block at a reasonable pace, preparing a simple meal and feeding herself, caring for her personal hygiene, and handling paper files. Dr. Settle stated that the only limitation on the claimant's functionality was her COPD. (R. 609-17).

*Mental Impairments*

In 2008, Dr. Boswell diagnosed the claimant with anxiety. (R. 673). In 2014, Northwest Alabama Mental Health Center diagnosed the claimant with a single episode of major depressive disorder, and she received therapy and medication. (R. 434). In 2015, the claimant requested to be moved to a less stringent psychiatric treatment plan and reported that she had quit smoking and felt calmer and less worried. (R. 698-706).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ. (R. 183). At the hearing, the claimant stated that she had a 10th grade education, could read and write, and could drive a car. (R. 45-46). The claimant stated that she was a life-long smoker. She had successfully quit for approximately seven months but by the time of the hearing had resumed smoking. (R. 52-53). The claimant testified at the hearing that she had suffered from a seizure disorder for years and recently had a small, atypical seizure. However, she had not had a grand mal seizure in six to eight years. (R. 50).

Concerning her mental health, the claimant testified that she had not been hospitalized for mental issues, but that she had been receiving therapy approximately once a month until she stopped going three to four months before the hearing. (R. 52).

The claimant testified that she had no problem sitting but walking was hard for her because of her breathing problems. At the hearing, the claimant stated that she could walk approximately 200 feet but then had to rest for a short time after. In regard to standing, the claimant answered that she could work in the kitchen for two hours before she had to rest. (R. 55).

The claimant testified that her current pain was caused by "catches" in her back when she bent over and that her hands "hurt real bad sometimes." The claimant stated that her pain was not "nine or ten pain" but that the pain occurred every day. (R. 53).

The ALJ asked the claimant to clarify her issues with her hands. The claimant stated that she had broken a lot of dishes because her hands gave out. She could not button tiny buttons, but could fasten big buttons and tie shoe laces. (R. 55-56). The claimant testified that Dr. Boswell had diagnosed her with carpal tunnel syndrome at some time during the 2000s. (R. 61). However, the ALJ observed that the record contained no objective documentation about the claimant's alleged carpal tunnel syndrome other than the "indeterminate" test by Dr. Bowell. (R. 71). At the claimant's request, the ALJ provided the claimant 30 days to submit documentation of the diagnosis. (R.74). However, the claimant failed to submit any new objective documentation evidencing carpal tunnel syndrome.

In addition, at the hearing the claimant testified that she could, with breaks, vacuum, clean her house for two hours, and do laundry. (R. 55, 58-59). The claimant did not provide details on how often she performed activities like cooking or laundry but stated that doing the "basic things" could take her all day. (R. 58). The claimant had no problem making decisions and being around other people. (R. 58). The claimant also attended church service three times a

week and helped clean the church three times a month. The claimant could watch television and read for up to three hours, but stated she had memory issues.[2] (R. 57, 60-61).

Finally, a vocational expert, Dr. David W. Head, testified concerning the type and availability of jobs that the claimant was able to perform. Dr. Head testified that the claimant's past relevant work as a cook helper, kitchen helper, and poultry processor ranged in classification from light to medium unskilled work. (R. 65). The ALJ asked Dr. Head to address a hypothetical in which an individual had the claimant's past work history and was capable of light exertional level work but would require a sit/stand option with "the retained ability to stay on or at their work station in no less than thirty-minute increments each without significant reduction of remaining on-task." (R. 66). The hypothetical individual could ambulate distances up to 75 yards on flat, hard surfaces; could occasionally climb ramps and stairs, but never ladders and scaffolds; could frequently stoop; and could occasionally crouch. (R. 66-67). The individual would need a supervisor or co-workers in close proximity because of potential seizure activity, and should not be exposed to unprotected heights, or pulmonary irritants and should not operate commercial motor vehicles. (R. 67). The hypothetical individual would be limited to routine and repetitive tasks, simple work-related decisions, and would be off-task approximately five percent of an eight-hour work day in addition to normal breaks. (R. 67).

The ALJ asked Dr. Head whether this hypothetical person could perform any of the past relevant work previously described. Dr. Head replied that the hypothetical person could not perform work like the claimant's past work, but such an individual could perform other work in the national economy. Specifically, Dr. Head testified that the hypothetical individual could work in an unskilled cashier job, a toll collector, or information clerk. (R. 66-68).

---

[2] The claimant alleged that she can watch a 30-minute television program but may not be able to later describe what it was.

On November 6, 2015, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 16). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2014, and had not engaged in substantial gainful activity since her amended alleged onset date of April 28, 2014.

Next, the ALJ found that the claimant had the severe impairments of mild coronary artery disease, third degree atrioventricular block with pacemaker, epilepsy, osteoarthritis/rheumatoid arthritis, COPD, and hypertension.

The ALJ noted that the claimant's medical records also indicated a history of gastroesophageal reflux disease, a colon problem, Bell's palsy, hyperlipidemia, and major depressive disorder. However, the ALJ noted that they were non-severe because the claimant did not demonstrate any ongoing restrictions because of those conditions.

Additionally, the ALJ found that objective medical documentation did not support the claimant's testimony that she had carpal tunnel syndrome. As a result, the ALJ found the claimant's alleged carpal tunnel syndrome could not be medically determined within the relevant period, and so the ALJ did not consider carpal tunnel syndrome in his findings. (R. 22).

Concerning mental impairments, the ALJ determined that the claimant's medically determinable impairments of anxiety and mild major depressive disorder did not cause more than a minimal limitation on her ability to perform basic mental work activities, and were non-severe. In making that finding, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments, 20 C.F.R., Part 404, Subpart P. Appendix 1 (the "Listing"). (R. 23).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Listing. The ALJ considered whether the claimant met the criteria for Listing Section 1.02, which addresses major dysfunction of the joints; Section 4.04, which concerns ischemic heart disease; Section 11.02, for convulsive epilepsy; Section 12.04, for affective or mood disorders; Section 12.06, concerning anxiety-related disorders; or Section 14.09, which addresses inflammatory arthritis.

Next, the ALJ determined that the claimant has the residual functional capacity to perform light exertional work with the requirement of a sit/stand option, with the retained ability to stay on or at her workstation in no less than 30 minute increments each without significant reduction of remaining on task. (R. 24).

In making his findings, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence.

Regarding the claimant's alleged chest pain, the ALJ found that the objective evidence, treatment history, and examination findings of Dr. Settle did not reflect the limitations the claimant alleged. The ALJ noted that Dr. Settle's findings showed the claimant to have "normal ventricular function with essentially normal coronary artery anatomy." The ALJ also observed that Dr. Settle opined that the claimant was able to perform activities that qualified as light exertion with manipulative, postural, and environmental restrictions. (R. 27). Additionally, when the claimant visited Dr. Mendelsohn, a cardiologist, for fatigue, dyspnea, shortness of breath, and

mild edema, Dr. Mendelsohn believed COPD, not the claimant's heart, likely caused her symptoms. (R. 521). Dr. Mendelsohn further reported that the claimant was capable of undergoing exercise testing or an exercise program. (R. 26).

The ALJ noted that the claimant reported having a seizure disorder for approximately 25 years, but he found no evidence of any further seizure activity. The claimant had been taking Dilantin and had not had a grand mal seizure for the last six years. Although the claimant testified she had a small, atypical seizure two years before the hearing, a CT scan in April 2014 showed the claimant's brain to be normal. (R. 26).

As to the claimant's arthritis, the ALJ found that she reported pain only intermittently. Whatley Health Services assessed the claimant with rheumatoid arthritis. However, the ALJ found that, at the time of the hearing, the claimant was only taking over-the-counter medication for pain. (R. 26).

The ALJ did not find the medical evidence supported the claimant's allegations of limitation from her COPD. Doctors found that the claimant had COPD and bronchitis; they advised her repeatedly to discontinue smoking; and she had Albuterol breathing treatments. In June 2015, the claimant stated her breathing had improved. (R. 26).

Furthermore, the ALJ noted that, although the claimant requires medication for her hypertension, she had not reported any ongoing limitations caused by the condition. The claimant reported that she had hypertension intermittently for many years but managed the condition with treatment. (R. 26-27).

The ALJ gave great weight to Dr. Settle's opinion because he performed a detailed examination, conducted his own testing, and cardiology is his specialty. The ALJ noted that Dr.

Settle's findings were consistent with the ALJ's determination that the claimant was capable of light work with manipulative, postural and environmental restrictions. (R. 27).

After assessing the claimant's residual functional capacity, the ALJ found that the claimant was unable to perform her past relevant work as a fast-food worker, a cook helper, a kitchen helper, and a poultry processor, because those jobs ranged from light to medium unskilled work with no sit/stand option. Nevertheless, relying on the vocational expert's testimony and considering the claimant's age, education, work experience, and RFC, the ALJ concluded that jobs exist in significant numbers in the national economy that the claimant could perform, such as a cashier, toll collector, and information clerk. (R. 29). The ALJ found the claimant not disabled.

## VI. DISCUSSION

The claimant argues that the ALJ failed to fully and fairly develop the record; that the ALJ wrongfully gave great weight to the opinion of the claimant's cardiologist, Dr. Settle; and that substantial evidence does not support the ALJ's finding that she can perform light work with a sit/stand option. To the contrary, this court finds that the ALJ fully and fairly developed the record, that substantial evidence supported the ALJ's decision to give great weight to Dr. Settle's opinion, and that substantial evidence supports the ALJ's decision,

*Issue 1: The ALJ's Development of the Record*

The claimant argues that the ALJ did not fully and fairly develop the record concerning her alleged carpal tunnel syndrome. Specifically, the claimant argues that the ALJ should have ordered additional EMG or NCV testing confirming her diagnosis after the ALJ determined the claimant's testimony to be insufficient evidence of diagnosis. This court finds the ALJ properly developed the record about the claimant's allegations of carpal tunnel.

True, the ALJ must develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *Graham*, 129 F.3d at 1422. Because of the ALJ's duty to develop the medical record fully and fairly, "it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Holladay v. Bowen,* 848 F.2d 1206, 1209 (11th Cir. 1988).

But the Social Security Act does not require evidence establishing the absolute certainty of a claimant's condition for an ALJ to make an "informed decision." *See id.* at 1210. Furthermore, the claimant bears the burden of proving her disability and is responsible for producing evidence that supports her claim. *Ellison*, 355 F.3d at 1276. "[The ALJ] is not required to take any . . . steps if he determines that weighing the available evidence will be sufficient [to make a decision]." *Latham v. Berryhill*, 2017 WL 1090659, at *4 (N.D. Ala. Mar. 23, 2017). So, unless "the record reveals evidentiary gaps [that] result in unfairness or clear prejudice," an ALJ's failure to order a consultative examination does not warrant remand. *Graham*, 129 F.3d at 1423.

Furthermore, when faced with the insufficiency of a claimant's medical record, the ALJ "has many options, but no affirmative requirements." *Latham*, 2017 WL 1090659, at *4; 20 C.F.R. § 404.1520. Instead of ordering a consultative examination, the ALJ may ask the claimant for more medical records or more information. *Latham*, 2017 WL 1090659, at *4.

The ALJ was not required to order additional EMG or NCV testing to confirm that the claimant had carpal tunnel syndrome. Sufficient evidence existed for the ALJ to make an informed decision concerning the claimant's condition; the record lacks the kind of evidentiary gaps that warrant remand for failure to develop the record. Instead of ordering tests, the ALJ

gave the claimant the opportunity to provide objective medical evidence of her carpal tunnel syndrome.

The claimant testified that, in the 2000s, Dr. Boswell diagnosed her with carpal tunnel syndrome. (R. 61). However, the ALJ noted that Dr. Boswell's records from 2007 to 2009 did not show any diagnosis or treatment of carpal tunnel. Rather, the EMG and NCV testing from August 2008 provided "indeterminate results," and Dr. Boswell recommended "clinical correlation," not additional EMG and NCV testing. After the hearing, the claimant then failed to present any further evidence of follow up testing or diagnosis after Dr. Boswell's lone test.

In making his decision that the record contained insufficient evidence of a medical diagnosis of carpal tunnel syndrome, the ALJ applied the Social Security Ruling 96-4p: "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." Without objective documentation supporting the claimant's allegation of carpal tunnel, the ALJ found the existence of carpal tunnel syndrome could not be medically determined within the relevant period.

The evidence in the record supports the ALJ's finding that the claimant failed to establish her carpal tunnel syndrome allegation with objective medical evidence. Notably, the claimant was packing chickens at Marshall Durbin Food Corporation in 2008 during the time of the EMG and NCV testing and the alleged diagnosis. (R. 238-39). In fact, the claimant continued to work packing chickens through 2009 and 2010, casting doubt on her inability to use her hands and the unsubstantiated carpal tunnel diagnosis. (R. 238). And, at the time of the hearing, the claimant also testified to being able to clean her house for a few hours, vacuum, do laundry for two

people, grocery shop, cook meals, clean her church three times a month, tie shoelaces, fasten big buttons, and drive a car. (R. 55, 58-61). Carpal tunnel is not recorded as one of the claimant's conditions in any of her subsequent medical records following Dr. Boswell's August 2008 examination.  Given all that consistent evidence about the condition of the claimant's hands, the court finds that the record contains no ambiguities or evidentiary gaps that prevented the ALJ from making an informed decision about the claimant's carpal tunnel syndrome.

And, in any event, the ALJ offered the claimant an opportunity to provide additional evidence to support her carpal tunnel syndrome allegation. (R. 73-74). The claimant failed to do so. The claimant cannot complain now that she did not have an opportunity to support her allegation with objective medical evidence.

And even a diagnosis of a condition alone is not enough to succeed on a disability claim. *Camarillo v. Colvin*, 2013 WL 4789244, at *5 (M.D. Fla. Sept. 9, 2013); *see also Moore v. Barnhart,* 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). A claimant must also demonstrate the resulting limitation from the condition that amounts to a severe impairment. *Camarillo,* 2013 WL 4789244, at *5.  As noted, the claimant testified to being able to perform several activities consistent with the ALJ's finding that she could perform light work with a sit/stand option.  And the claimant does not appear to contend that additional testing for carpal tunnel syndrome would have revealed further *limitations*, only that it might confirm her carpal tunnel syndrome diagnosis.  So even if the claimant had established a diagnosis of carpal tunnel syndrome at the time of the hearing, she failed to show any limitations resulting from that condition that amounted to a severe impairment, and was, therefore, not prejudiced by the lack of a consultative examination on carpal tunnel syndrome.  *See Graham*, 129 F.3d at 1423.

The ALJ did not err by failing to order a consultative examination or additional testing, and the court will not remand on this ground.

*Issue 2: The Great Weight Given to the Opinion of Dr. Settle*

Next, the claimant argues that the ALJ erred by giving the opinion of Dr. Settle, a consultative examining cardiologist, great weight. Specifically, she contends that Dr. Settle's opinion on the claimant's ability to perform light work falls outside his specialty because he is not a pulmonologist. The court disagrees with the claimant's contention and finds that substantial evidence supports the ALJ's decision to give Dr. Settle's opinion great weight.

"[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011); *see also MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986). In determining the weight to accord to medical opinions, the ALJ must consider multiple factors including "the examining relationship, the treatment relationship, whether an opinion is amply supported, whether an opinion is consistent with the record, and a doctor's specialization." *Poellnitz v. Astrue,* 349 F. App'x 500, 502 (11th Cir. 2009). But, the ALJ may reject a medical opinion if evidence in the record supports a contrary determination. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). The more consistent a physician's opinion is with the record in its entirety, the more weight an ALJ should place on that opinion. *Poellnitz*, 349 F. App'x at 502. However, should an examining consulting physician's opinion contradict the record as a whole, the ALJ errs by relying upon it. *Marlow v. Astrue*, 2010 WL 1753597, at *7 (M.D. Ala. Apr. 30, 2010).

The ALJ articulated specific reasons for giving the opinion of Dr. Settle great weight, namely, his detailed examination, his own testing that was performed, and his specialty in

cardiology. Moreover, the claimant does not point to any evidence contradicting Dr. Settle's opinion.

Although Dr. Settle is not a pulmonologist, Dr. Settle reached his conclusion by performing a physical examination, performing a new EKG, reviewing the claimant's medical history, and assessing previous cardiac procedures. (R. 609-10). As a result of these cardiac assessments, Dr. Settle – a cardiologist – was able to rule out congestive heart failure or coronary artery disease as the cause of the claimant's limitation and concluded that the limitation was likely due to the claimant's COPD. (R. 617).

Dr. Settle's opinion is consistent with the record. Dr. Farrell Mendelsohn – another cardiologist – likewise found that COPD, not cardiac issues, caused the claimant's symptoms. (R. 521). Additionally, the claimant herself testified to being capable of the same activities Dr. Settle reported, such as shopping, ambulating without assistance, preparing meals, and feeding herself. (R. 45-61, 617). Claimant fails to identify any evidence that undercuts Dr. Settle's opinion, and the ALJ did not err by giving that opinion great weight.

*Issue 3: The Claimant's Residual Functioning Capacity to Perform "Light Work"*

The claimant next argues that substantial evidence does not support the ALJ's RFC assessment. The claimant does not provide a legal argument to support this conclusion, but instead simply restates her conditions: shortness of breath, fatigue, edema, joint swelling, and COPD. (Plaintiff's Brief, 15-16). The court finds that substantial evidence supports the ALJ's determination of the claimant's ability to perform "light work" with the requirement of a sit/stand option.

The court reviews *de novo* the legal principles upon which the Commissioner's decision is based in a Social Security case. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir.

2007); *see also Moore*, 405 F.3d at 1211 (11th Cir. 2005). However, the Commissioner's factual findings need only be supported by substantial evidence. *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001).

The claimant challenges the ALJ's assessment of her RFC. "The residual functioning capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. § 404.1545(a). The ALJ makes this determination by considering the claimant's physical, mental, and other abilities affected by the impairment(s). 20 C.F.R. § 404.1445(b)-(d). Light work involves lifting a maximum of twenty pounds; carrying ten pounds often; a good deal of walking; or sitting while operating arm and leg controls. 20 C.F.R. § 404.1567(b).

The ALJ relied upon relevant evidence, including objective medical evidence, to determine the claimant's RFC assessment. (R. 24-28). The ALJ found the medical evidence showed the claimant has some limitations, but not limitations amounting to a disability as defined by 20 C.F.R. § 404.1520. (R. 25). He found that the claimant is able to perform an "essentially normal range" of daily activities with breaks. (R. 27). The ALJ's findings are supported by Dr. Settle's opinion that the claimant was "capable of performing activities consistent with light exertion and additional manipulative, postural, and environmental restrictions." (R. 27). In addition, Dr. Mendelsohn, a treating cardiologist, stated that the claimant would be able to participate in an exercise program. (R. 486-526).

The ALJ also looked to the claimant's self-reported activities, which are consistent with his conclusion that the claimant can perform "light work." The claimant reported no limitation in her ability to sit and can stand for about two hours, though she can only walk about 200 feet. The

claimant testified she could do household chores in increments and help clean her church three times a month. And although the claimant's driver's license was suspended because of her previous history of epilepsy, she otherwise is capable of driving and can understand directions and make decisions. (R. 45-61).

Substantial evidence thus supports the ALJ's findings that, although the claimant's medically determinable impairments could reasonably cause the alleged symptoms, the claimant's allegations of the "intensity, persistence and limiting effects" of these conditions were not credible.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court will AFFIRM the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

**DONE** and **ORDERED** this 29th day of March, 2018.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE